# United States Court of Appeals
## For the First Circuit

No. 02-2496

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES GOMES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

Mark L. Stevens, by appointment of the Court, for appellant.
Donald L. Cabell, Assistant U.S. Attorney, with whom Michael
J. Sullivan, United States Attorney, was on brief for appellee.

July 21, 2004

**COFFIN**, <u>Senior Circuit Judge</u>.  Appellant James Gomes challenges the sufficiency of the evidence underlying his conviction for conspiracy to possess cocaine base with intent to distribute, in violation of 18 U.S.C. § 846.  He claims that the evidence, which described a single purchase, showed only a buyer-seller relationship and not the requisite agreement to deal drugs.  Because we believe the jury reasonably could find a plan between appellant and his seller to further distribute the cocaine, we affirm the conviction.

## I. <u>Factual Background</u>

Gomes originally was targeted by law enforcement agents as part of an extensive undercover investigation into illegal firearms dealing in and around Brockton, Massachusetts.  Two paid government informants, Jose Troche and Neil Baptista, purchased two firearms from Gomes in September 2000.  The drug sale at issue here arose when the three men met again on December 11, ostensibly for another gun transaction.  Because the conspiracy charge is based entirely on interactions that occurred that day, we shall recount the sequence of events in some detail.  We present the facts as the jury rationally could have found them, based on the testimony and other evidence presented at trial, and in the light most favorable to the government.[1]  <u>United States</u> v. <u>Fenton</u>, 367 F.3d 14, 17 (1st

---

[1]  Troche was outfitted with recording equipment and the conversations among the men that day were taped.  The audio recordings were played for the jurors, who also were given

-2-

Cir. 2004); United States v. Henderson, 320 F.3d 92, 97 (lst Cir. 2003).

The trio came together on December 11 when Troche and Baptista drove in Troche's car to pick up Gomes at his home in Brockton at about 3 p.m. Gomes directed Troche to a multi-unit dwelling at 68 Calmar Street, also in Brockton, and on the way he offered to obtain some crack cocaine for Troche and Baptista. Gomes told the others that they could easily make money selling cocaine and that it would take him about an hour to get the drug. When they reached 68 Calmar Street, Gomes went inside alone. He returned about ten minutes later and reported a price of $1,500.

The men then left 68 Calmar Street and, as they drove around, discussed the possibility of dealing drugs together. At one point, Gomes stated that he was planning to purchase half a kilogram for $15,000. The informants dropped Gomes off at his house and then met with their law enforcement handlers to discuss the drug proposition. The pair was given $1,500 in cash to buy drugs, and they picked up Gomes again and returned to 68 Calmar Street to buy the cocaine.

Troche testified that all three men went inside, and Gomes then introduced Troche to the apartment's tenant, a woman named Jannelle. The transcript of the audio recording indicates a

transcripts of the recordings. Troche and Baptista also testified at trial.

-3-

slightly different sequence of events.[2]  It appears that Gomes initially went upstairs to check on the status of the drugs and then came back outside, either with Jannelle or followed by her shortly thereafter.  Troche apparently was introduced to Jannelle at that time, before going up to her apartment.  Other people also were outside the building, at least some of whom went inside when someone announced that the police were coming.  In the apartment, Troche at one point observed Gomes speaking with Jannelle, but he could not hear the conversation.  At the conclusion of their exchange, Gomes approached Troche and told him the cocaine was not ready yet.

The three men left the apartment, drove around for a few minutes, and then returned to 68 Calmar Street.  At this point, Troche's testimony and the transcript again diverge somewhat.  From the transcript, supplemented by the testimony where helpful, it appears that all three men re-entered Jannelle's building, but that Gomes initially entered the apartment without the other two.  He came back out into the hallway to negotiate with Troche on a final price for the drugs, agreeing upon $1,350, and Troche gave him the cash.  The transcript suggests that all three men entered the apartment at this time, at which point Jannelle became upset that there were so many people there.  Baptista and a number of others

_____

    [2]  This difference, as well as others noted _infra_, have no impact on our analysis.

left.  Appellant remained in the apartment, and Troche also stayed briefly, but he then walked down the stairs and waited in a stairwell.  Ten to fifteen minutes later, Troche knocked on the apartment door, which was opened by Gomes, who told him that the cocaine was ready.  Troche followed Gomes into the apartment, where he saw Jannelle hand Gomes a plastic bag containing an ounce of crack cocaine.  Gomes walked over to Troche and handed him the drugs.  The two men then left the apartment and building together.

Gomes was arrested a week later and ultimately charged with two counts of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1), and one count of conspiracy to possess five or more grams of cocaine base with intent to distribute, in violation of 18 U.S.C. § 846.  The jury found him guilty on one of the firearms counts and the drug count.  He was sentenced to ten-year prison terms on each of the two counts, to be served concurrently.  On appeal, he challenges only his drug conspiracy conviction.

## II. Discussion

Appellant asserts that the government failed to prove that he conspired to distribute cocaine because the record contains no evidence of an agreement between him and Jannelle to pursue jointly an unlawful objective and instead shows only a simple drug purchase.  To establish a conspiracy, the government needed to show that the defendant "entered into an agreement with another to

commit a crime, here, an agreement . . . to distribute cocaine . . . ." United States v. Innamorati, 996 F.2d 456, 469-70 (1st Cir. 1993); see also Fenton, 367 F.3d at 19 ("A conspiracy is an agreement between two or more persons, including the defendant, to commit a particular crime."). Appellant is correct that a single drug sale, without more, does not establish a conspiracy. See United States v. Rivera-Ruiz, 244 F.3d 263, 269 (1st Cir. 2001). But we have observed that "[e]ven a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice," United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993). See also, e.g., Rivera-Ruiz, 244 F.3d at 271; United States v. Portela, 167 F.3d 687, 696-98 (1st Cir. 1999).

The question we thus face is whether there are sufficient meaningful threads in the details of the single sale before us to permit the jury to find a joint undertaking. Viewing the evidence, as we must, in the government's favor, and drawing from it all reasonable inferences, we think there are.

In his opening conversation with Troche and Baptista about drug dealing, during the first trip to Calmar Street, appellant asserted that he could obtain drugs within the hour and that the other two could make significant money selling cocaine. A jury reasonably could infer from this dialogue that appellant had an on-going relationship with a supplier, giving him confidence that he

could acquire cocaine virtually as soon as he asked for it. And, in fact, that inference was reinforced by the subsequent series of events, beginning with the $1,500 offer after the first stop at Calmar Street (when appellant went inside alone) and concluding with the transfer of cocaine from appellant to Troche. The evidence indicates that, as the drug preparations proceeded in Jannelle's apartment, she remained comfortable with appellant's presence despite her discomfort with others being there. A jury could thus find that Jannelle's conduct as she worked on the cocaine reflected a familiar course of dealing between the two in relation to her drug activity.

Even if a history of repeated sales of small quantities left room for doubt about a conspiracy to further distribute the drugs, the facts in this record offer more. Here, the circumstances include Troche's visible presence as appellant's waiting customer. When Jannelle objected to the large number of people in her apartment, Troche – a newcomer to this group – was nevertheless allowed to stay with appellant. Later, after waiting in the stairwell for some time, Troche was brought into the kitchen and became the final recipient – in Jannelle's presence – of the newly prepared drugs she handed to appellant. Moreover, the price negotiations were suggestive of consultation with Jannelle; both the $1,500 original amount and the $1,350 ultimate price were

offered after appellant returned from a solo entry into her apartment.

While these facts do not compel an inference that the sale to Troche was a joint enterprise of appellant and Jannelle, they at least render such a conclusion reasonable. Circumstantially, the evidence suggested that appellant regularly procured drugs from Jannelle and that, at least in this instance, she knew that he was making the purchase on behalf of a customer who was waiting nearby. The actual transfer occurred in her kitchen, and the jury reasonably could conclude that she observed it take place. In other words, the evidence points not simply to a sale to Gomes but to a delivery of cocaine to Gomes for further distribution to another. Given that "[t]he evaluation of the facts is entrusted largely to the jury," Moran, 984 F.2d at 1303, and that "[w]e defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence," United States v. Passos-Paternina, 918 F.2d 979, 985 (1st Cir. 1990), we cannot say that the jury's outcome here was unsupportable.

The judgment of conviction on the drug conspiracy count is therefore affirmed.